# IN THE COURT OF APPEALS OF TENNESSEE
# AT KNOXVILLE
## Assigned on Briefs April 3, 2012

# IN RE: RONI M.H.

**Appeal from the Juvenile Court for Bradley County**
**No. J10124      Daniel Swafford, Judge**

**No. E2011-02691-COA-R3-PT-FILED-APRIL 30, 2012**

The Juvenile Court for Bradley County ("the Juvenile Court"), upon a petition by the State of Tennessee, Department of Children's Services ("DCS") and following a trial, terminated the parental rights of Debbie D. ("Mother") to the minor child Roni M.H. ("the Child") pursuant to Tenn. Code Ann. § 36-1-113 (g)(1) and Tenn. Code Ann. § 36-1-113 (g)(3) (2010). Mother appeals the termination of her parental rights. We find and hold that clear and convincing evidence existed to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113 (g)(1) and Tenn. Code Ann. § 36-1-113 (g)(3), and that clear and convincing evidence existed that the termination was in the Child's best interest. We, therefore, affirm the Juvenile Court's order terminating Mother's parental rights to the Child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**
**Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which HERSCHEL P. FRANKS, P.J., and JOHN W. MCCLARTY, J., joined.

Wilton Marble, Cleveland, Tennessee, for the appellant, Debbie D.

Robert E. Cooper, Jr., Attorney General and Reporter; and, Lindsey O. Appiah, Assistant Attorney General; for the appellee, State of Tennessee, Department of Children's Services.

Lynn Perry, Guardian Ad Litem.

# OPINION

## Background

The Child was born in April 2010. DCS removed the Child shortly after her birth based upon Mother's alleged drug use. In May 2010, at an adjudicatory hearing regarding the Child, Mother, then on probation for theft, was arrested in court for violation of probation as a result of a failed drug test. In March 2011, DCS filed a petition in the Juvenile Court seeking to terminate the parental rights of Mother and Ronald H., the Child's father.[1] The case was tried in August 2011.

Mother testified first. Mother, then incarcerated based on her violation of probation, testified that she anticipated getting out of jail in October 2011. Mother had been in jail continuously since May 2010. Mother acknowledged that she failed drug screens for methamphetamine after the birth of the Child on April 29, 2010, and May 14, 2010. Mother stated that the drug screen results were accurate. Mother denied that she admitted at the adjudicatory hearing that the Child had been neglected, but the adjudicatory order, admitted as an exhibit, showed that the judgment was uncontested.

Mother testified to various programs she participated in while in jail and exhibits documenting her participation were entered into evidence. Mother received a certificate and letter for completing an anger management program. Mother testified that she worked as a trustee while in jail. Mother also had a certificate representing five "supported employment sessions." Mother testified that she completed a "self-worth" program that included an Alcoholics Anonymous component. When asked, however, about the 12-step program, Mother could identify only three of the 12 steps. Also introduced were letters written by Mother to her attorney inquiring about visiting the Child. Mother acknowledged that she could not produce any letters in which she inquired about the Child before DCS filed the petition to terminate her parental rights to the Child.

Mother acknowledged that, in her permanency plan of April 2010, she promised to get an alcohol and drug assessment. Mother testified that she tried to seek such an assessment but was refused because she was "clean." Nevertheless, Mother affirmed that she was still "hooked on meth" when she went to jail. Mother admitted to using methamphetamine at the time the Child was born.

---

[1]Ronald H. did not contest the termination of his parental rights to the Child and is not a party on appeal.

Mother testified that she had not worked at a job outside of jail in over four years. Prior to that, Mother had worked in construction, at Hardee's, and at Captain D's. Since her last job, Mother had relied on disability checks. Mother's disability checks were cut off while she was in jail. Mother testified that she had a mental illness. Mother testified that in the future, she would look at potential employers such as Dynasty Spas and Hardee's for a job. In jail, Mother served as a dietitian, having been promoted from the tray room.

Mother stated that she did not have a place of her own to live, but that she could live with either her mother or her friend Sherry G. Mother stated that she was attempting to be admitted to The Next Door, a live-in facility. Mother was unaware as to whether this facility would allow children to live there.

Mother testified that she was married to Junior D. Junior D. was, at the time of trial, "in jail for meth." A letter was entered as an exhibit in which Mother wrote to Ronald H. that she intended for Junior D. to adopt the Child. The letter was written approximately three weeks before the trial. Mother testified that her purpose in writing about a proposed reconciliation with Junior D. was so that Ronald H. would "leave [her] alone."

Ronald H. testified next. Ronald H. testified that he was the Child's father. Ronald H. stated that although he never took a blood test, he acknowledged that the Child is his. Ronald H. met Mother at the muffler shop where he worked in 2009 and the two subsequently began a relationship. Ronald H. stated that Mother had poor relations with her alcoholic mother and that he rented a room for himself, Mother, and one of Mother's other children. The three moved to a larger apartment. Ronald H. testified that "[Mother] started disappearing for about four and five days at a time." Ronald H. stated that Mother was a regular user of methamphetamine and that he saw her use the drug. Ronald H. testified that for Mother, methamphetamine use was: "a[n] everyday ordeal. An eight- or ten-day stretch without would be too much." Ronald H. further testified that Mother used methamphetamine while pregnant with the Child, including up until the last two weeks of pregnancy. Ronald H. testified that Mother never took any action about her methamphetamine abuse beyond getting an assessment. Ronald H. stated that he earlier had voluntarily agreed to a termination of his parental rights. Ronald H. also stated that he had met the Child's foster parents and felt that the Child was in the "perfect spot" with them.

On cross-examination, Ronald H. stated that he was a truthful person "according to who it's going to hurt" and that "for children, at times there might be an exception." Ronald H. also acknowledged that he was engaged in a property dispute with Mother. Ronald H. testified that his negative feelings towards Mother had no effect on his testimony.

Lisa Blankenship ("Blankenship"), a family service worker for DCS, testified next. Blankenship was assigned to the Child's case and met with Mother. Blankenship testified to her efforts to keep in touch with Mother:

> Prior to her being incarcerated, the facilitator, Beth Logan, and I went out to her home. She was not home. We left a note or a card of some sort saying that we were there and how to contact us. Actually, I believe that was prior to the child and family team meeting that we had. And I sent notices to -- well, when she was incarcerated, I sent notices of hearings or meetings, scheduled meetings, to her attorney.

Blankenship testified that she never received a call from Mother after their meeting. Blankenship testified that a required condition before Mother would be allowed to have visitation with the Child was that Mother had to pass a hair follicle drug screen. Blankenship stated that she never received a passing hair follicle test from Mother. Blankenship testified regarding the Child:

> Q. And in your opinion, would it be safe for this child, assuming [Mother] were released from jail today, would it be safe for this child to return to her home?
>
> A. No.
>
> Q. Why not?
>
> A. The lack of residential stability, the lack of being drug free of her own volition and not because she doesn't have a choice. Those are pretty much the -- and lack of income or --
>
> Q. Have you seen in this case, during your involvement in this case, any indication that the conditions that brought the child into custody are likely to change any time in the foreseeable future?
>
> A. No.

Hendree H. ("the Foster Father"), the foster or resource father of the Child, testified last. The Foster Father, an Episcopal priest, was married and had a six year old daughter. The Foster Father's wife was a fourth grade teacher. The Foster Father testified that the Child was healthy and had bonded with him and his wife. The Foster Father stated that his six year old daughter got along well with the Child.

After the trial, in December 2011, the Juvenile Court entered its detailed order terminating Mother's parental rights to the Child after finding and holding, *inter alia*:

Abandonment by Incarcerated Parent – Wanton Disregard
T.C.A. Section 36-1-102 [](1) (A)(iv)

Conclusion of Law:
The State has proven the grounds of Abandonment by Wanton Disregard by clear and convincing evidence. In support of this conclusion, the Court makes the following findings of fact:
1. The Respondent engaged in conduct prior to incarceration which exhibits a wanton disregard for the welfare of the child.
2. The Respondent was in jail all of the four months prior to the filing of the Petition to Terminate Parental rights. She was arrested at the May 27, 2010 adjudicatory hearing, and has remained in jail ever since.
3. The Respondent has failed to provide evidence that she has made efforts to secure an early release from incarceration so that she may assume her responsibilities as a parent. Although the Respondent testified that time was being subtracted from the "front" and "back" of her sentence, upon cross examination, she admitted that this assertion was based only upon conversations with a Lieutenant Hickman and a friend, Sherry [G.].
4. Prior to incarceration, as well as after incarceration, the Respondent failed to keep in contact with DCS about the wellbeing of her daughter. The Respondent testified she did not know her case manager's name, and produced several returned letters which had been addressed to DCS using a street address contained in an old telephone book. DCS foster care case manager Lisa Blankenship, testified that she gives her business cards to every parent attending one of her child and family team meetings. Ms. Blankenship also testified she sent notices to the Respondent, and went as far as going to the Respondent's home and leaving a note. Ms. Blankenship's testimony was credible. The Respondent's attorney produced several letters addressed to him wherein [Mother] had expressed concerns about the child and generally sought visitation. However, as revealed by the guardian ad litem's cross examination of the Respondent, each of those letters appears to be dated after the date of filing of the Petition to terminate parental rights.
5. As a ground for termination of parental rights, abandonment is not curable. Once the Petition to Terminate Parental Rights has been filed, the ground cannot be abrogated by the subsequent acts of the Respondent. The Respondent presented several certificates of completion for programs she had enrolled in while incarcerated. Most certificates were likewise dated after the

date of filing of the Petition to Terminate Parental Rights.

6.  The Respondent needed only to submit a clean hair follicle drug screen to begin having visits with her daughter.  Subsequent to the April 26, 2010, permanency plan meeting, the Respondent completed at least three drug screens, two of which were hair follicle.  Nothing prevented the Respondent from enrolling in a drug treatment program at any time between the removal of the child and the Respondent's May 27, 2010, incarceration.  She did not enroll in a treatment program during this period.  Her efforts after incarceration were minimal.  Her account of her effort to complete the twelve step program during her incarceration is unpersuasive.  She was able to relate a vague understanding of the first three steps, but was unable to tell the Court anything further about the twelve steps or the progress that she had made.  The respondent did not contest the adjudication of the dependency and neglect proceeding on May 27, 2010, although DCS was alleging that she had used methamphetamine throughout her pregnancy.  Based upon the adjudicatory order contained in the certified record, it appears that the Respondent did not understand the dangers of using methamphetamine during pregnancy, and it appears she still does not understand the risks to small children, both born and unborn, when parents use that substance.  She continued to use the substance in utter disregard for the wellbeing of her child.

7. Respondent [Mother] admitted that approximately three weeks prior to trial, she had written a letter wherein she expressed an intention to reconcile with [Junior D.], and to allow him to adopt the child. [Mother] admits that this reconciliation and adoption would not be good for the child.  Mr. [D.] has a history of drug involvement, and is currently incarcerated for charges related to methamphetamine.

8. Based upon his own personal knowledge and observation during the period that he cohabited with [Mother], Ronald [H.] testified that [Mother] used methamphetamine throughout her pregnancy with [the Child].  He testified he assisted the Respondent in a plan to pass drug screens, and that she went more than once to Hiwassee Mental Health for alcohol and drug assessments, but never followed up on these assessments. [H.] also testified the Respondent's living arrangements were unstable and that the Respondent would disappear for days.  The testimony of Mr. [H.] was credible.

Persistent Conditions
T.C.A section 36-1-113(g)(3)

Conclusion of Law:
The State has proven the grounds of Persistent Conditions by clear and

convincing evidence.  In support of this conclusion, the Court makes the following findings of fact:

1.  The Respondent has a long history of substance abuse and has had four children removed from her custody prior to this proceeding.  Two of these prior removals resulted in terminations.  Despite this prior involvement with DCS due to drug use, Lisa Blankenship testified the respondent continued to deny this drug use for some time. [The Child] was removed from the custody of the Respondent by court order, and has remained in DCS custody and foster care for a period in excess of six months.  Respondent testified she has not worked for several years and initially testified that she does not have plans for living arrangements other than she may live with her mother or a friend when released from confinement.  Respondent admitted later under cross examination her real plans are to live with [Junior D.], who is currently incarcerated for methamphetamine.

2.  The Respondent has not made changes in her conduct or circumstances that would make it safe for the child to go home.  The Respondent remains addicted to methamphetamine, and untreated for that addiction.  She presents the excuse that prior to her incarceration; she was unable to obtain drug treatment because of clean drug screens.  It appears she does not understand, or does not want to understand, the distinction between actually being off drugs, and merely giving a clean drug screen.  Circumstances arose after the removal of the child, which make it even more unsafe for the child to return to the Respondent's home.  The Respondent was jailed for using drugs during her probation, and she has remained in jail.  She has expressed [an] intention to bring [Junior D.] back into her life and into the child's life, which greatly increases the chance that she will fall back into her endless pattern of methamphetamine abuse.  The respondent testified she wishes to attend drug treatment at Valley, but admitted she has not spoken with a counselor or made any serious efforts to obtain this treatment. [Mother] has chosen, and continues to choose, methamphetamine over her child.  The Respondent does not have a clear idea as to where she will live or how she will support herself after release.  Continuation of the parent-child relationship greatly diminishes the child's chances of being placed into a safe, stable and permanent home.

3.  Conditions which led to the removal or which in all reasonable probability would cause the child to be subject to further neglect or abuse still persist and prevent the child's safe return to the parent.

4.  There is little likelihood the conditions will be remedied at an early date to allow reunification in the near future.  Past conduct is the best indicator of future conduct.

<u>Best Interests</u>
<u>T.C.A. Section 36-1-113(i)</u>

Conclusion of Law:

The Court finds the State has proven this termination is in the child's best interest by clear and convincing evidence. In support of this conclusion, the Court makes the following findings of fact:

1. The mother is currently incarcerated due to violation of probation for failing a drug screen. The underlying charge was theft over $1,000.00. (Trial Exhibit 1- records of Bradley County Criminal Court)

2. The mother testified she is expecting to be released on October 19, 2011 due to "good time", however, she admits she was denied parole in December 2010 and if she is required to flatten her sentence, her incarceration will not end until June, 2012.

3. The child has not seen its mother since it was released from the hospital after birth. A meaningful relationship has not been established between parent and child.

4. At the time of trial, the child was approximately 16 months old.

5. The only caregivers or parental figures the child knows are the foster parents.

6. The foster parents are willing to give the child permanency through adoption. The child has been in the resource home of [the foster parents] since she was removed into the State's custody. The [foster parents] have been married twelve years and have lived in Athens, Tennessee for six years. They have a six year old daughter they call a "big sister." [The foster mother] is a fourth grade teacher, and [the foster father] is an Episcopal priest. The child is bonded with both.

7. The Respondent failed to present a clean drug screen and as a consequence has not maintained regular visits with the child.

8. The Respondent has remained addicted to methamphetamine, and untreated for that condition, making her unable to care for a child in a safe and stable manner. The respondent's almost inevitable resumption of methamphetamine use will only result in further separations between her and the child, and thereby prevent her from ever becoming a protective and reliable parent for the child. The Respondent does not appear to have a clear idea as to her future residence and source of support. The lack of a stable home and the history of use of controlled substances render the Respondent consistently unable to care for the child in a safe and stable manner. The Respondent has not made an adjustment of conduct as to make it safe and in the child's best interest to be in her home.

The Juvenile Court concluded its order by terminating Mother's parental rights to the Child and placing the Child under the full control of DCS. Mother appeals the termination of her parental rights.

## Discussion

We restate Mother's issues on appeal as follows: whether the Juvenile Court erred in finding and holding that grounds existed to terminate Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113 (g)(1) and Tenn. Code Ann. § 36-1-113 (g)(3). Although Mother did not raise this issue, we also will address whether the Juvenile Court erred in finding and holding that it was in the Child's best interest for Mother's parental rights to be terminated.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

> This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

> It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and parental rights may be

terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 Tenn. App. LEXIS 941, at **16-17 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

We first address whether the Juvenile Court erred in finding and holding that grounds existed to terminate Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113 (g)(1) and Tenn. Code Ann. § 36-1-113 (g)(3). In pertinent part to this appeal, Tenn. Code Ann. § 36-1-113 (g) provides:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and non-exclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

* * *

-10-

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

   (A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

   (B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

   (C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;….

Tenn. Code Ann. § 36-1-113 (g) (2010). As pertinent to this appeal, Tenn. Code Ann. § 36-1-102 provides:

(1)(A) For purposes of terminating the parental or guardian rights of parent(s) or guardian(s) of a child to that child in order to make that child available for adoption, "abandonment" means that:

* * *

   (iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has willfully failed to visit or has willfully failed to support or has willfully failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; or ….

Tenn. Code Ann. § 36-1-102 (1)(A)(iv) (2010).

The Juvenile Court found that clear and convincing evidence existed to terminate Mother's parental rights for engaging in conduct prior to her incarceration that exhibited a wanton disregard for the welfare of the Child pursuant to Tenn. Code Ann. § 36-1-102 (1)(A)(iv) (2010). Mother, among other things, vigorously argues that the evidence of her drug abuse in the course of her pregnancy with the Child is inadequate to sustain this ground.

Initially, we note that the Juvenile Court made a number of findings regarding Mother's behavior after her incarceration. For the purposes of considering this ground for terminating Mother's parental rights, we will restrict our review to Mother's behavior prior to her incarceration as required by the statute.

As this Court stated in *In re: Audrey S.*: "We have repeatedly held that probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *In re: Audrey S.*, 182 S.W.3d 838, 867-68 (Tenn. Ct. App. 2005). The evidence in the record is overwhelming that Mother had a drug abuse problem prior to incarceration. Mother herself admitted that she was "hooked" on methamphetamine at the time of the birth of the Child. Mother later was arrested for testing positive for drugs at the adjudicatory hearing concerning the Child.

Mother takes particular issue with Ronald H.'s testimony regarding Mother's drug use during her pregnancy with the Child. Mother argues that Ronald H.'s testimony was not credible because of a variety of factors, including his property dispute with Mother and his statement that it "depends" when he tells the truth. As our Supreme Court has instructed:

> When credibility and weight to be given testimony are involved, considerable deference must be afforded to the trial court when the trial judge had the opportunity to observe the witnesses' demeanor and to hear in-court testimony. *Estate of Walton v. Young*, 950 S.W.2d 956, 959 (Tenn. 1997) (quoting *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996)). Because trial courts are able to observe the witnesses, assess their demeanor, and evaluate other indicators of credibility, an assessment of credibility will not be overturned on appeal absent clear and convincing evidence to the contrary. *Wells v. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

*Hughes v. Metro. Gov't of Nashville and Davidson County*, 340 S.W.3d 352, 360 (Tenn. 2011).

After a careful review, we find nothing in the record that could support, by clear and convincing evidence, our overturning the Juvenile Court's credibility determination regarding Ronald H. The Juvenile Court did not err in finding and holding that clear and convincing evidence was introduced such that grounds were proven to terminate Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113 (g)(1) and Tenn. Code Ann. § 36-1-102 (1)(A)(iv).

The Juvenile Court also found that grounds existed to terminate Mother's parental rights pursuant to Tenn. Code Ann. § 36-1-113 (g)(3), the ground concerning persistent conditions. Drug abuse appears to be at the heart of Mother's long-term problems. We, as was the Juvenile Court, are disturbed by what appears to be a cat and mouse game from Mother. Mother seems unable to distinguish between being "clean" at any given moment as opposed to actually taking serious, concrete steps to tackle her underlying drug abuse problem. The record reveals that Mother never has comprehensively addressed her drug abuse problem. On the contrary, Mother seems to be in denial about the magnitude of her problems. Mother has undergone a drug and alcohol assessment but never has actually been treated for her habitual drug habit, a significant omission. Mother could remember only three of the 12 steps from a 12-step program. While we understand that people have imperfect memories, Mother's rather egregious memory lapse regarding the 12-step program did little to suggest that she seriously has addressed her drug abuse problem, especially in the absence of any other serious efforts on her part to combat her drug addiction.

Based on the record before us, it is clear that Mother will not be in a position to take on the role of parent to the Child any time in the near future. The Juvenile Court did not err in finding and holding that clear and convincing evidence existed that grounds were proven to terminate Mother's parental rights to the Child pursuant to Tenn. Code Ann. § 36-1-113 (g)(3).

We next consider whether the Juvenile Court erred in finding and holding that it was in the Child's best interest for Mother's parental rights to be terminated. The relevant statutory provision is Tenn. Code Ann. § 36-1-113 (i), which provides:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

-13-

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113 (i) (2010).

The record reveals a pattern of drug abuse by Mother. Indeed, Mother was arrested at the adjudicatory hearing regarding the Child for a violation of probation based upon her failing a drug screen. No meaningful relationship has developed between Mother and the Child. Mother, incarcerated as of trial, unfortunately has minimal residential or employment prospects. Additionally, we are concerned, as was the Juvenile Court, that

Mother's "almost inevitable resumption of methamphetamine use" will prove detrimental to the Child. Meanwhile, the record reflects that the Child is getting on well in a suitable environment with her foster family. The Juvenile Court's findings, made under a clear and convincing evidence standard, are supported by a preponderance of the evidence.

The evidence in the record on appeal does not preponderate against the findings made by the Juvenile Court under the clear and convincing evidence standard that grounds for terminating Mother's parental rights were proven and that it was in the Child's best interest for Mother's parental rights to be terminated. We, therefore, affirm the Juvenile Court's order terminating Mother's parental rights to the Child.

### Conclusion

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Debbie D., and her surety, if any.

_____
D. MICHAEL SWINEY, JUDGE